IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Bradley J. Delp Revocable Trust, etc., et al.,          Case No. 3:14 CV 591

                    Plaintiffs,                         MEMORANDUM OPINION
                                                        AND ORDER
          -vs-
                                                        JUDGE JACK ZOUHARY
MSJMR 2008 Irrevocable Trust, etc., et al.,

                    Defendants.


### INTRODUCTION

This case represents ongoing business disputes between brothers, Plaintiff Bradley Delp and Defendant Cleves Delp (and their related trusts).  This declaratory judgment lawsuit asks this Court to sort out the two brothers' ownership of certain Delp companies.  Discovery took a sharp detour in February 2015, when Brad produced documents that appeared to have been taken from Cleves without his permission; documents dated during a period in 2011 when the brothers' business relationship was unraveling.

After reviewing Brad's document production, Cleves moved for sanctions under this Court's inherent authority, alleging Brad had stolen the documents.  Brad eventually filed a sworn affidavit (JX 1) claiming that, on four occasions in 2011, he obtained the documents from the Maumee headquarters of the Delp family of companies.  Some he took from an office conference room; others he printed from Cleves' e-mail inbox.  During these four searches, Brad looked for evidence that Cleves and Brad's former attorney and business partner, Chris Erblich, conspired to strip Brad of his interest in certain Delp companies.  Brad argues their plan was never fully executed; he remained an

owner, justifying his search for Cleves' documents, and produced in discovery all the material obtained from these searches.

Following a three-day evidentiary hearing, it became clear that Brad took Cleves' documents in bad faith, and Brad now refuses to disclose the true nature and extent of his theft.  Under these circumstances, dismissal with prejudice is the only appropriate sanction.

### STANDARD OF REVIEW

Four factors guide this Court's decision of whether to grant the sanction of dismissal with prejudice:

> (1) whether the party's conduct was due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions [are appropriate] . . . .

*Fharmacy Records v. Nassar*, 379 F. App'x 522, 524 (6th Cir. 2010) (brackets omitted) (citing *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005)).  This Court may only issue sanctions under its inherent authority for bad-faith conduct.  *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002).  A plaintiff acts in bad faith if his or her "conduct . . . display[s] either an intent to thwart judicial proceedings or a reckless disregard for the effect of [the] conduct on those proceedings."  *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008) (quotation marks omitted).

"[T]he dismissal of a claim . . . is a harsh sanction which the court should order only in extreme situations showing a clear record of contumacious conduct by the plaintiff."  *Id.* at 736 (quotation marks omitted).  That said, in an appropriate case, dismissal with prejudice may be the "first and only sanction" for a plaintiff's bad-faith conduct.  *See id.* at 738.

2

Cleves brought his Motion on the heels of an April 2015 deposition, during which Brad repeatedly invoked his privilege against self-incrimination when questioned about how he obtained the documents.  In his Motion, Cleves largely urged this Court to draw adverse inferences against Brad based on these privilege assertions (*see, e.g.*, Doc. 70 at 10) ("By invoking his Fifth Amendment rights and refusing to answer questions related to his possession of and access to Cleves Delp's privileged and confidential information, Bradley Delp has guaranteed that neither the Court nor Cleves Delp will ever know the extent of his malfeasance.").

However, with leave of this Court (Doc. 79), Brad later withdrew his privilege assertions and provided an affidavit and hearing testimony setting forth his version of events.  Cleves insists that dismissal with prejudice remains the only appropriate sanction, because that testimony consists of "lies and deliberate disobedience . . . [that] have frustrated the Court's attempt to fully understand the extent and prejudicial effect of his misconduct" (Doc. 99 at 2).  Material portions of Brad's testimony are contradicted by the record, Cleves argues, leaving unknown the full extent of Brad's theft (*id.* at 3–11).

Brad counters that he has provided a full and truthful account of how and why he came to possess the documents at issue (Doc. 84 at 12).  Further, he claims he acted on a good-faith belief that, as a company owner, he had authority to access, review, and retain all Delp company documents.  Similarly, the fact that Brad voluntarily produced these documents shows his good-faith efforts to litigate this case (*id.* at 12–13)  According to Brad, none of these documents prejudice Defendants' ability to defend this lawsuit (*id.* at 15–21; *see also* Doc. 100 at 5–15).[1]

---

[1] This Court grants Cleves' Motion to rejoin as a defendant TFO-TDC, LLC (Tr. 1:5), which had previously been dismissed without prejudice.  Defense counsel formally made the Motion at the evidentiary hearing.  Plaintiffs' counsel objected, stating defense counsel had given "no advance

**DISCUSSION**

This Court concludes, after careful review of the record, that Brad's theft swept more broadly than he claims and, further, that he refuses to truthfully and fully disclose the extent of his theft. Brad's affidavit and hearing testimony suffer from a fundamental lack of credibility. Because of many gaps and contradictions in that testimony, neither Cleves nor this Court will ever know the full extent of Brad's theft. Under these circumstances, sanctions short of dismissal with prejudice, cannot remove the taint and prejudice to this litigation.

To arrive at these conclusions, this Court first summarizes Brad's version of the four searches. Second, with respect to each of the searches, this Court examines the hearing record to determine (to the extent possible) what in fact happened during each search. Third, this Court considers whether Brad believed in good-faith that he had authorization for the searches. Fourth, this Court considers whether, based on these factual findings, sanctions should issue under this Court's inherent authority.

**Brad's Version of Events**

A few background facts set the stage for Brad's conduct. Brad maintains that, through a revocable trust, he owns 49 percent of the shares in TDC Companies, Inc. ("TDC") (JX 1 at 1). TDC is "essentially a management company" that provides administrative services (*e.g.*, IT services) for several Delp entities (Tr. 1:187). Each Delp entity, in turn, provides a specific client service: DelTuck focuses on employee benefits, DelRisk on property casualty insurance, and so on (Tr. 1:190). Brad

---

notice of this" Motion (Tr. 1:6). In fact, defense counsel had raised the prospective Motion in a phone conference held prior to the hearing, and this Court instructed the parties to make all such housekeeping motions at the hearing itself. Plaintiffs' counsel also vaguely argues that re-adding a party that Brad had originally sued would "be unduly prejudicial" (*id.*). No prejudice exists for Brad, because the evidence Defendants put on and their litigation theory -- that Brad had stolen documents and is concealing the exact nature of his searches -- is not affected by the addition of TFO-TDC.

4

claims he and Cleves are equal partners in TDC (Tr. 3:53–54).  The Delp Independence Trust holds the remaining 2 percent of TDC shares, and lawyer Dominic Spinazze serves as trustee (Tr. 3:54).  Brad also believes that he and Cleves own equal shares of DelHold LLC (JX 1 at  2).  DelHold appears to be a holding company, owning (among other things) all shares in DelTime, which in turn owns the Maumee building and most of its contents (Tr. 1:49).  Brad is also the sole owner of Delp & Company, an insurance consultancy (DX K; Tr. 1:53–54).

Until June 2011, Brad maintained office space at the Maumee building, with access to the building using a key fob system (DX V; Tr. 1:104).  In mid-2010 (DX U), Brad moved from an office adjoining Cleves' office to a smaller suite located further from Cleves in the building's west wing.  This intraoffice move reflected the brothers' separation, driven in part by differing business interests and in part by the brothers' acrimonious relationship (Tr. 3:31–32).  Because of its small size, Brad "affectionally called [this new] office the broom closet," and he preferred to work in one of the building's more spacious conference rooms (Tr. 1:72–73).  Delp company officers and employees also used the conference rooms to hold client meetings (*e.g.*, Tr. 1:192).

The first of Brad's four admitted searches occurred on March 29, 2011 (Tr. 1:64).  On that day, Brad spent several hours working in the main conference room (*id.*).  He claims, while in the conference room, he fetched a notepad from the conference room hutch where he coincidentally found two documents (Tr. 1:61; *see also* JX 2).  The first is a February 15, 2011 e-mail between Cleves, Cleves' attorney, and Pat Boyle, TDC's President and Chief Operating Officer.  In the e-mail, Cleves asks his attorney to prepare an agenda for a "strategy phone call" that included discussion of the brothers' ongoing disputes (JX 2 at 1369; *see also* Tr. 1:186).  The second document is the February 18 call agenda.  Marked "attorney-client privileged communication," the agenda lists discussion

5

topics such as "Brad Delp's relationship with TDC Companies" (*id.* at 1371–72).  As with all the documents at issue, Brad claims he first shared these February 2011 documents when he gave them to a paralegal in February 2015 just before a document production deadline in this case (*e.g.*, Tr. 1:62, 64, 87, 89).

Brad's next search occurred several weeks later on May 12.  Brad met with a client near the end of the business day (Tr. 1:74–75).  His account of what happened next deserves some detailed discussion, because, as will become clear below, Brad's account is incredible in view of the hearing record.

Brad claims that, after the client meeting, he returned to his former office, now a new conference room connected to Cleves' office by a sliding door.  Brad sat down in the conference room to write file notes, following up on his last client meeting, and to "reflect[] upon the day, and on [his] meeting" earlier that day with Cleves and Cleves' attorney (Tr. 1:74–75, 77).  After this period of reflection, Brad entered Cleves' office; Brad says he did so with no particular purpose in mind (Tr. 1:77–78).

> Q.    You just entered his office just to enter it?
> A.    Curious
>
> Q.    Curious about what?
> A.     I was just curious.
>
> [The Court]:    Curious about what?
>
> A.    What was on his desk, you know, what papers were, you know -- yeah, what was on his -- what was on his desk.

Brad sat behind Cleves' desk; he glanced at the documents on Cleves' desk for thirty seconds, and perhaps glanced at office shelving; he did not open desk drawers; and he did not look at Cleves' computer screen to discover if the monitor was active, had a screen saver running, or had entered a

6

power-saving mode (Tr. 1:78–80).  Instead, he looked at Cleves' computer mouse.  For no apparent reason, he "jiggled" the mouse and Cleves' e-mail inbox "pop[ped] up" without the need to enter a password (*id.* at 79–80).  Brad claims he did not know Cleves' password (Tr. 1:81).

Brad again paused to reflect on the morning meeting with Cleves and his attorney.  He performed an inbox search for the word "Erblich" (*id.*); he performed no other searches (Tr. 1:85).  He claims he printed and produced all the e-mails he reviewed, but that he did not review all the e-mails returned by the search (Tr. 1:81–83).  He did not review all the e-mails because he "saw enough, and . . . wanted to vomit" (Tr. 1:83).  And because his search results sickened him, he did not open up any e-mail attachments (Tr. 1:86, 91), including a Case Map that was attached to one e-mail, even though he opened, read, printed, and produced the transmitting e-mail (JX 3 at 1367).  His search lasted, at most, 45 minutes (JX 1 at  9).

A month later, on June 9, Brad landed two more documents (JX 4) in the main conference room, located in essentially the same place as the documents he found earlier on March 29 (Tr. 1:96–97).  Later in June, Cleves had Brad and Delp & Co. staff move out of the Maumee building, and Boyle had their key fobs deactivated (Tr. 1:201).

Following extended personal travel, Brad returned to the Maumee building on Saturday July 16 for the first time since the June move (Tr. 1:105–06).  While he argues that, as a continuing owner of the company he did not need Cleves or Boyle's authorization to enter the building, at the time of his Saturday evening visit he knew he did not have keycard access:  "We were locked out, yes." (Tr. 1:104).  Brad claims he returned to the building "to check on [his] personal belongings," although he was unaware of any of his personal belongings the movers left behind (Tr. 1:105–106).  The Maumee building includes office space rented by tenants who are not affiliated with the Delp companies.  An

employee of a tenant let Brad in (Tr. 1:106).  He wandered the building for 15 minutes, but did not search for or take any documents (Tr. 1:107–08).

Brad returned to the building the next day, Sunday July 17.  He claims he entered the empty building through the main lobby door, which was unlocked (Tr. 1:111).  The building was empty. Brad's testimony for why he returned to the building is vague.  His affidavit does not explain why he made this second weekend visit, and during the hearing he denied returning "to obtain e-mails and documents" (Tr. 1:112).  He says that, unlike the prior day when his visit was cut short by the need to attend a grade school reunion, he was not pressed for time on Sunday and simply "walked around" the building (Tr. 1:112 & 118).  But he did more than take a stroll.

Despite his statement that he had not returned to the Maumee building to search for documents, he nonetheless entered Cleves' office and gained access to Cleves' computer by, again, simply jiggling the computer mouse (Tr. 1:113).  Brad denied, again, examining the computer monitor to see what mode it was in before he jiggled the mouse (Tr. 1:114–15) ("I went right to the mouse."). He claims, again, he searched for "[o]ne term, 'Erblich'" (Tr. 1:115); printed and produced all the e-mails he reviewed (*id.*; *see also* JX 5); did not review any e-mail attachments, including a draft mediation statement attached to one of the printed e-mails (Tr. 1:121, 124; *see also* JX 5 at 1488); did not enter a password to access Cleves' computer (Tr. 1:113); did not look at files contained in Cleves' computer (Tr. 1:121); and ended his inbox search because the search results "disgusted" him (Tr. 1:115–16).  Brad estimates he spent some "30ish" minutes reviewing Cleves' e-mails (Tr. 1:118).

Since July 17, 2011, Brad claims he has visited the Maumee building about three times, and only for client meetings (Tr. 1:141–42).

**Brad Conceals a Broader Search of Cleves' Computer and Office**

Brad's story does not square with the record in several respects. Brad's claim that he found documents in the main conference room on March 29 and June 9 is not credible. Brad's description of how he accessed Cleves' computer is also not credible. So are important aspects of Brad's alleged inbox searches: Brad contends he performed a single word search of Cleves' inbox; the hearing record shows he either performed additional searches, or reviewed much more of Cleves' inbox. Brad also says he did not review attachments, yet the hearing record plainly shows he did. And more generally, Brad's description of his searches was evasive.

***Brad did not Stumble on Documents in the Conference Rooms.*** The documents Brad claims to have found in the main conference room on March 29 concern a phone call held on February 18. According to Brad, these documents sat undisturbed in a conference room for 39 days. The documents Brad claims to have found in the same conference room on June 9 are dated May 15 and 20, respectively. According to Brad, these documents sat undisturbed in a conference room for up to 25 days.

These claims are implausible. TDC administrative assistant Beth Loy testified that, at the beginning of each work day, following each use of a conference room, and at the end of each work day, either she or co-worker Carol Willits would tidy up the conference rooms according to an established routine (Tr. 2:36–37, 39, 41, 42). If Loy found a document belonging to Cleves, she would place the document on Cleves' chair, but she cannot recall ever returning material to Cleves left behind (Tr. 2:39; *see also* Tr. 2:48). More specifically, she states that, had documents been stored in the conference room hutch where Brad claims to have found them, she "would have definitely . . . pulled them" (Tr. 2:40). Boyle explained why the Delp companies use this conference room sweep

9

policy: many clients cycle through the conference rooms in a given day, and during these meetings employees and clients discuss sensitive financial information.  The staff takes steps to maintain the confidentiality of this sensitive information (Tr. 1:197).

Brad's chance "discovery," not once, but twice, is simply not credible.  But even if papers could have evaded Loy or Willit's attention, it is improbable that Cleves left any documents behind in the first place.  The March 29 documents (JX 2) contain privileged discussion of Cleves' strategy in handling his separation with Brad.  Cleves would not have absentmindedly left such documents, for 39 days, in a conference room that he knew Brad could access.  Like Brad, Cleves is a sophisticated businessman.  Moreover, Cleves had no reason to print the June 9 documents (Tr. 2:64). Nothing in the record gives this Court reason to doubt that testimony: the June 9 documents are brief, general comments (JX 4 at 1444), or reflect draft comments to a letter later sent to opposing counsel (*id.* at 1429).

Brad did not find these documents in the conference rooms; he obtained the documents from another source within the building.  This gap in Brad's testimony is most plausibly filled by concluding that Brad obtained the March 29 and June 9 documents in the same way he obtained all the other documents he has disclosed: by searching Cleves' inbox or rummaging through Cleves' office.

***Brad Wrongly Accessed Cleves' E-mail Inbox.***  Brad claims that on May 12 and July 17, he accessed Cleves' email inbox by simply jiggling the computer's mouse, and denies using a password to access Cleves' computer.

That testimony too is implausible.  During relevant time periods, both brothers were registered representatives of LPL Financial, and their businesses were subject to regulation by the U.S.

Securities and Exchange Commission.  Both LPL and the SEC required password-protection for all building computers; periodic audits checked compliance with the password requirements (Tr. 1:149, 152, 162).  Under these requirements, after 15 minutes of inactivity, each Maumee computer would enter a screensaver mode, and 15 to 45 minutes after that, the computer would enter a power-save mode (Tr. 1:165–66).  After the screensaver or power-save trigger, a user would need a password to access the computer desktop (Tr. 1:166).  Further, after 2010, e-mail services for TDC and Delp & Co. employees were placed into separate "containers" on TDC's server, such that the employees of one company could not access the e-mail inboxes or calendars of employees of the other company (Tr. 1:148).  Months before Brad's first search, then, Brad and Cleves' e-mail inboxes stood on either side of this "container" dividing wall, and neither brother would have access to the other's e-mail inbox or calendar.

Brad therefore could have accessed Cleves' computer in one of four ways.

1.      Brad could have hacked Cleves' computer, bypassing the password requirement or puncturing the separation between Outlook "containers," but Brad does not have the computer skills to hack a computer on his own, and the record lacks evidence or plausible inferences that he gained help from a computer hacker (*e.g.*, Tr. 3:35).

2.      Brad could have accessed Cleves' computer within 15 minutes of Cleves' use of the computer, at a time before the computer entered the screensaver mode.  But on May 12, Cleves left his office more than an hour before Brad accessed his computer (Tr. 2:63; DX X at 2; *see also* Tr. 1:74–76).  And on Sunday July 17, Cleves had been out of the office since Wednesday July 13 (Tr. 2:67–68; DX X at 11–12).  On both occasions, then, Cleves' computer sat inactive long enough to trigger password-protection measures.

11

3.     The password requirement could have been deactivated, allowing Brad access to the desktop from the screensaver or power-save mode without use of a password.  Only Ryan Valek, TDC's in-house IT staffer, could have disabled the password requirement, and he denies he ever did (Tr. 1:151).

4.     Brad could have known and used Cleves' password.  Cleves kept a written copy of his password in an area "easily accessible to somebody who sat in [his desk] chair" (Tr. 3:36).

In light of all the evidence, it is apparent that Brad, somehow, knew Cleves' password to access Cleves' computer.  Because testimony on this point goes to the heart of how Brad accessed Cleves' computer, Brad's testimony that he did not use a password is a deliberate lie.

***Brad's Searches Cannot be Squared with the Record.***  Brad described certain limits to the scope of his inbox searches, saying he performed a single keyword search and did not review e-mail attachments.  The record contradicts both claims.

Brad claims he performed a single keyword search on May 12 and July 17, searching only for e-mails containing the word "Erblich" (Tr. 1:85, 115–16).  However, he produced e-mails that do not include that search term -- not as a sender, receiver, nor in the subject line or body of the e-mail -- and therefore would not have been returned by the "Erblich" search (JX 5 at 1446–1447, 1461, 1478).  When confronted with this fact during the hearing, Brad could not explain why his production would contain documents that could not have been returned by the single search he claims he performed (Tr. 1:127):

Q.     How in heaven's name did [JX 5] 1447 come up on a search of the word "Erblich"?
A.     I obviously printed this e-mail, and I produced it.

12

> Q.    Mr. Delp, you performed more searches than just on the word "Erblich," correct?
>
> A.    Incorrect.  I only searched "Erblich."

Similarly, Brad states he did not review or print e-mail attachments (Tr. 1:120).  His catalogue of the documents he printed from Cleves' computer includes documents that are not e-mails (*e.g.*, JX 5 at 1448–58).  Brad accessed these documents either by opening e-mail attachments, or searching Cleves' computer hard drive in addition to the e-mail inbox.

***This Court has no Confidence that Brad Produced all the Misbegotten Documents.***  A refrain in Brad's testimony is that he printed and produced all the e-mails or documents he reviewed. For several reasons, this Court doubts that is so.  Brad reviewed more e-mails or documents than he cares to reveal.

First, Brad testified that he spent 45 minutes reviewing Cleves' inbox on May 12 (Tr. 1:82), and 30 minutes searching Cleves' inbox on July 17 (Tr. 1:129).  Yet, Brad printed, he says, only seven e-mails on May 12 (JX 3), and fifteen e-mails (several of which are duplicative printings of sequential e-mails in one e-mail chain) or documents on July 17.  What was he doing all that time, especially considering the allegedly scandalous nature of the material Brad had reviewed (Tr. 1:83) ("I saw enough, and I wanted to vomit.")?

Second, two of the e-mails Brad printed carried extremely sensitive attachments: (1) Cleves' attorney's Case Map, setting forth Cleves' legal strategy in the brothers' business disputes, and (2) a draft mediation statement Cleves' attorney had prepared for submission to a mediator who unsuccessfully mediated the dispute on July 19, 2011.  Brad claims he did not review either document (Tr. 1:91, 124).  In other words, Brad asks this Court to believe that he was more interested in the e-mails that transmitted these sensitive documents than he was in the documents themselves.  Of all

13

Brad's evasions at the hearing, the claim that he did not review these sensitive documents is perhaps the most implausible.

Brad explains he showed this level of restraint even though he was on a search for evidence of a conspiracy against him (Tr. 1:83). If that was his mission, what better source of such information than Cleves' case blueprint or his ex parte statement to a mediator? Brad would not have refrained from viewing these documents, on the grounds they were privileged, because he accessed and retained other documents marked as attorney-client privileged (*e.g.*, JX 2 at 1371–72). In fact, Brad accessed the e-mail transmitting the draft mediation statement two days *before* the mediation was held (Tr. 1:125), and therefore could have learned the opposing party's settlement strategy right before this important meeting. This Court has no doubt that Brad reviewed both documents.

Third, even as to the documents he produced, Brad failed to provide a convincing explanation for how he came into possession of certain documents. Exhibits O (at 1481–82) and P (at 1483–84), are successive e-mails in a July 1, 2011 e-mail chain between Erblich, Cleves, Boyle, and TDC accounting employee Mike Lenkay. The e-mails were printed from Cleves' inbox, and discuss referral sources and commissions for certain Delp companies. Brad did not include the e-mails as attachments to his affidavit, even though the affidavit purported to comprehensively identify how and when Brad obtained each of the documents at issue.

In addition to being omitted from the affidavit, the e-mails stand out for their print footer. Brad claims that, when he printed an e-mail from Brad's inbox, he did not alter Cleves' printer settings and sent all print jobs to the same printer, located near the reception area (Tr. 1:85–86). The vast majority of e-mails Brad produced carry identical print headers and footers -- in the page's lower lefthand corner a print-date stamp, and in the page's upper righthand corner a page count. Exhibit O

14

and P's print footers do not match any of the other e-mails Brad admits he retrieved from Cleves' inbox, and these exhibits do not show when they were printed.  The exhibits were therefore sent to a different printer, or used different settings than the other e-mails Brad produced.  Cleves did not print the e-mails (Tr. 2:65–66).  He would have had no reason, for example, to print Exhibit P, which is identical to Exhibit O, but contains Erblich's one-word response -- "Thanks."  And for his part, Brad had no explanation for how these documents would have wound up in his hands (Tr. 1:134–46).  The e-mails are dated after Brad and Cleves' relationship had deteriorated to the point where each sought physical separation of their workplaces and had already begun discussing mediation dates.  Cleves therefore would not have handed this information over to Brad, and Brad does not even suggest that Cleves did.

Finally, and importantly, there is evidence that Brad could access the building on his own even after the June 2010 lockout, when his building key fob was deactivated.  Brad claims the building was unlocked on Sunday July 17 when he arrived (Tr. 1:111–12).  This Court doubts Brad's testimony on this point.  The prior day, the building had been locked, as Boyle testified it would be on weekend days (Tr. 1:200–01).  Brad maintained some form of access to the Maumee building, but refuses to disclose this form of access.  The record supports three alternatives.

1.      Brad secreted away a physical key to the Maumee building.  While access to the building's high-traffic entrances is controlled by a key fob system, other building entrances are accessed using a physical key (Tr. 1:200).  Boyle testified Brad did not have a key to these low-traffic doors (Tr. 1:201).  But other testimony suggests Boyle is mistaken.  Valek testified that in late summer or early fall 2011 (*i.e.*, after Brad's office move), Brad entered the Maumee building using one of the low-traffic entrances (Tr. 1:172 ("Well, first off he came in the side door back by where

the benefits department was. That's not -- that wouldn't be normal or typical[, using the door and not the front office door]. . . . I sat right by that back door, so I know he did come in that door.")); *see also* Tr. 1:173 (explaining the "broom closet" was located near the benefits department, on the building's west side).

2.      Brad gained access to the building and unlocked a side door, so that he could return to the building at a later time. For instance, Brad was in the building on July 16, the day before he claims to have walked through the building's unlocked front door. He could have easily withdrawn a door deadbolt from the inside in anticipation of his return. Indeed, Boyle found the north door in such a state in November 2012 (Tr. 1:202–03).[2]

3.      Brad could have gained access to the building through third parties, as he did with a building tenant on July 16, and through cleaning woman Debra Matz "a few times" (Tr. 3:46).

Here, as elsewhere, Brad's incomplete and incredible testimony leaves this Court with only inferences to draw from the evidence, and all of these inferences confirm that Brad has only told part of the story.

---

[2] Boyle also found a mail tote lying in an unnatural area of the office and immediately associated the mail tote with Brad (Tr. 1:202–03), because, as the evidence shows, Brad's habit was to use a mail tote "like[] a large briefcase" while he and Cleves' relationship was ongoing (Tr. 1:101). To follow-up on this hunch, Boyle called Bob Armbruster, owner of the building's cleaning service, and asked if a cleaning employee had let anyone in the building on the prior night. Boyle said that Armbruster spoke with cleaning woman Debra Matz, and confirmed that she had let Brad in the office (Tr. 1:203).

While this Court earlier indicated it would allow this testimony to stand for whatever value it had (Tr. 1:204), it is now clear that Boyle's recitation of Armbruster's conversation with Matz is inadmissible hearsay. There is no cleaning-crew exception to the Rule Against Hearsay. In any event, Matz could not recall specific dates she let Brad into the office (Tr. 3:47).

*Summary.*  Brad refuses to fully and truthfully disclose the nature and extent of his searches at the Maumee building.  The evidence shows Brad did not stumble upon documents in the conference rooms on March 29 or June 9; he instead obtained these documents, most likely, in Cleves' office. And on May 12 and July 17, Brad did not stumble onto Cleves' e-mail inbox, performing only a single keyword search.  He entered Cleves' office with the deliberate intention of searching for documents belonging to his brother, used Cleves' password to access his computer, and performed a more broad-ranging search than Brad is willing to admit.

### Brad's Primary Justification for his Search is a Post-Hoc Justification that is Contradicted by the Record and, in any event, Objectively Unreasonable

Another refrain in Brad's testimony is that he did not act in bad faith because, at the time he performed his searches, he believed he was still an owner of relevant Delp companies and had the authority to access and review company property.  "Because I am a rightful owner of TDC and was trying to establish the deception committed by my brother Cleves and my former lawyer Erblich, I did not believe my actions in taking the at-issue documents was wrong" (JX 1 at  14).  However, Brad's own statements, made near in time to the searches, show that in spring and summer 2011, he believed he had sold his interest in the same Delp companies.  And even accepting Brad's post hoc justification for the searches, the conclusion that he draws from his alleged ownership status -- that he could rifle through his brother's possessions -- is objectively unreasonable and not a good faith basis to conceal what is, plainly called, theft.

At the hearing, witnesses discussed at length an alleged sale in early 2010 of Brad's interest in TDC and DelHold to the TDC Trust, with Cleves as a beneficiary (Tr. 1:208, 2:87).  While Brad admits a deal was discussed then, he claims it was never completed because the parties disagreed over key terms (Tr. 3:61).

17

However Brad had a very different assessment of his ownership just before and during the time he took Cleves' documents.

- Brad had not been a W-2 employee of TDC since, at the latest, January 2009 (Tr. 1:47).

- In August 2010, Brad wrote Cleves, alleging Cleves was "in default of the promissory note associated with the Purchase and Sale agreement of my interest in DelHold LLC" and declared the note payable immediately (DX G).

- In fall 2010 (Tr. 1:43), Brad filed a federal return for the 2009 tax year, claiming a sale in his partnership interest in DelHold in an amount that did not exceed his basis in that partnership interest (DX H at 110).

- In February 2011, Brad's attorney wrote Cleves, stating among other things that "you and Bradley J. Delp entered into certain transactions involving the transfer of various interests in various entities," and requesting copies of the transaction documents (DX A at 1357–58).

- That same month, Brad's attorney wrote Spinazze, stating with respect to both DelHold and TDC, "Mr. [Brad] Delp believes this was a sale to a certain trust entity created by Mr. Delp," and again asking for copies of the transaction documents (DX B at 1360–61).

- In July 2011, less than a week before the July 17 search, Brad wrote Spinazze, in Spinazze's capacity as the TDC Trust Special Trustee.  Brad stated it was his intent "that I would be able to *reacquire* the stock of the The Delp Company [that he had granted or sold to the Trust] from the Trust at a later date," and asked Spinazze to use his authority as Special Trustee to substitute Brad for Cleves' family members as the "persons having the power to withdraw assets [from the Trust] and substitute additional assets of equivalent value," because Cleves had refused to make such a substitution (DX F at 2) (emphasis added).

Clearly Brad thought he had sold his interest in the relevant Delp companies when he took Cleves' documents, and therefore did not access Cleves' office on the understanding that he was a company owner.  Brad's response, that the above statements in these documents were simply him "shooting in the dark" about his ownership status, is not credible (*see, e.g.*, Tr. 1:16, 20, 41).  None of the

18

documents, least of all his federal tax return, reflect such a hedged or nuanced understanding of the alleged sales.

Moreover, Brad's alleged good-faith belief about his ability to search Cleves' office is unreasonable.  Brad points to no case law standing for the proposition that a shareholder has a right to access and use company property.  *See, e.g.*, *Kaiser v. Bowlen*, 455 F.3d 1197, 1208 (10th Cir. 2006) ("It is . . . well established as a 'basic tenet of American corporate law . . . that the corporation and its shareholders are distinct entities' and an 'individual shareholder . . . does not own the corporation's assets.'" (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003) (ellipses in original)).  And legal authority aside, Brad provides no explanation for why he could reasonably expect he had the authority to sift through Cleves' e-mail inbox and office, at a time when Brad believed Cleves was an equal shareholder in the relevant Delp companies.  He cannot, because equal business partners do not treat each other in this way.  Brad's reliance on the TDC Employment Policies & Procedures manual, which informs employees that the company could monitor company e-mail accounts, also falls flat (Doc. 84 at 9; *see also* Doc. 84-2 at 24–25).  Those policies define the Company's relationship with its employees, and Cleves was a company owner and officer, not an employee.

Brad's justifications for his search are either contradicted by the record, unreasonable, or both.  More than that, Brad's own conduct confirms he had no reasonable basis to believe his purported ownership status allowed him to access Cleves' documents.  If in 2011, Brad truly believed he had a right to access Cleves' inbox and other documents, he would have asserted his rights like any other businessman by demanding access to the documents and, if refused, file for injunctive relief.  Instead,

19

whenever Brad searched in Cleves' office, he did so after business hours or on a weekend, when another TDC employee or tenant would not be around.

Brad apparently recognized that this surreptitious, after-hours access to Cleves' office is indicative of a bad-faith purpose, because in his affidavit Brad wrote that he accessed Cleves' computer on May 12 "in the plain sight of other TDC employees in the building at that time" (JX 1 at 9). The import of this statement is clear: TDC employees were present in the building on May 12 when Brad accessed Cleves' computer, saw Brad doing so, and thought nothing of Brad's presence in Cleves' office because they did not confront Brad or tell Cleves they had seen Brad using his computer. But, as it happened, Brad does not know if another person saw him using Cleves' computer, or even if another person was in the building during his search sessions. As he explained at the hearing: "The plain sight [described in my affidavit] was I was in an office with a window in plain sight of any employee that would be in the building at that time and would have walked by. And we have employees that worked late. I wasn't the only one that worked late" (Tr. 1:77) (emphases added). The material gaps, between Brad's affidavit and what he later admits at the hearing, are telling.

### Cleves has Shown Bad Faith Conduct

As should by now be clear, Brad's conduct "display[s] . . . an intent to thwart judicial proceedings or a[t the least] reckless disregard for the effect of his conduct on those proceedings." *Schafer*, 529 F.3d at 737 (quotation marks omitted). At a time when he believed he no longer had any ownership share in relevant Delp companies, on at least four occasions, Brad snuck into Cleves' office looking for information Brad believed would help frustrate Cleves and Erblich's scheme. That is theft. And the business dispute that motivated that theft is the same dispute that forms the basis for

20

this lawsuit.  The record shows Brad somehow gained access to the building during times when it would otherwise be locked, or entered the building during regular business hours through doors that normally are locked from the inside.

And, if all of this conduct was not bad enough, Brad attempted to cover up the nature and extent of his searches by offering incredible hearing testimony.  Portions of that testimony are so squarely contradicted by the record on points so fundamental to the nature of the searches, or reflect such intricate tales of how he obtained certain documents, that this Court cannot reasonably ascribe the contradictions to faulty recall or innocent misstatements.  Because Brad alone is responsible for the bad-faith conduct in this case, he does not benefit from the more forgiving treatment courts typically afford in cases where sanctions are sought for an attorney's missteps.  *See, e.g.*, *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir. 1999) ("This court has been reluctant to uphold the dismissal of a case merely to discipline an errant attorney because such a sanction deprives the client of his day in court." (quotation marks and ellipsis omitted)); *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997) (explaining appellate review of dismissal with prejudice as a sanction is "more stringent[] in cases where the plaintiff's attorney's conduct is responsible for the dismissal"); *Carter v. City of Memphis, Tenn.*, 636 F.2d 159, 161 (6th Cir. 1980) (reversing dismissal with prejudice as a sanction because "[t]he plaintiff [wa]s blameless").

Brad makes much of the claim that "[u]nlike most motions for sanctions, this case involves documents that Plaintiffs voluntarily and timely produced, not documents that were concealed or destroyed by a party" (Doc. 84 at 8) (emphasis omitted); *see also* Doc. 78 at 4 (same).  "If [he] intended to be malicious," Brad argues, "he would have kept the subject documents secret and not turned them over to Plaintiffs and designated them as confidential" (Doc. 100 at 2).

21

To be sure, the case for a bad-faith finding would be stronger had Brad been caught destroying or concealing the documents. But there is evidence enough of Brad's bad faith, even with his "voluntary" production. And Brad's insistence that his document production shows a litigant attempting to "come clean" about his conduct rings hollow in light of his incredible hearing testimony about his searches.

**Cleves has Shown Prejudice from Brad's Bad-Faith Conduct**

Cleves invested a significant amount of attorney time and money attempting to uncover the nature and extent of Brad's theft. In return, Brad provides evasive, incomplete, and at times false testimony. More important for the future course of this litigation, however, Cleves "know[s] little more now than [he] did when [he] began about how" Brad obtained the documents and how much more broadly his search ranged. *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 155 (6th Cir. 1988), *overruled on other grounds as recognized in Vance, by & Through Hammons v. United States*, 182 F.3d 920, at *6 (6th Cir. 1999) (table). For good reason, Cleves worries about the documents Brad reviewed and how those documents affected Brad's legal strategy prior to and during this case (*see, e.g.*, Tr. 2:78). And this Court worries that, because Brad has refused to play by the Civil Rules, his conduct has tainted the proceedings. How can Cleves believe this case will proceed on a level playing field?

Cleves can have no resolution to these questions and concerns. Brad's primary attempt to deflect any finding of prejudice is therefore unavailing. Focusing only on the documents he produced, Brad organizes the documents by subject-matter and purports to show that the document categories are either not material to this lawsuit or were discoverable by Brad (*see* Doc. 100 at 5–12). Brad correctly observes that most of the documents are not attorney-client privileged. But the fact remains

that Brad has not provided truthful testimony regarding the nature and extent of his searches or produced all the documents he reviewed.

### Brad had Adequate Notice of the Sanctions Requested

Following Brad's February 2015 production, defense counsel raised with this Court the issue of possible document theft, and this Court granted leave to depose Brad "regarding allegations that he improperly obtained attorney-client communications between Defendants and their counsel" (Doc. 64). That deposition occurred in late April 2015 (*see* Doc. 66). That same month, Cleves sought, and obtained, leave of Court to move for sanctions (Doc. 67). Cleves filed the Motion in late-May 2015 (Doc. 70). Brad then moved for appointment of a special master to conduct a privilege review of the stolen documents and for an extension of time (Doc. 72), and Cleves opposed (Doc. 74). This Court set a hearing to discuss both the Sanctions and Appointment Motions, but denied Brad's request for an extension of time to oppose the Sanctions Motion, observing that under the briefing order then in effect Brad would have had two months to oppose (Doc. 75).

Because of attorney health issues, this Court granted Brad's request for an extension of time in July 2015, delaying both the hearing date and opposition deadline until late August 2015 (Doc. 77). Then, shortly before these new due dates, Brad filed a "combo motion," seeking an evidentiary hearing on the Sanctions Motion, permission for Plaintiffs' counsel to view documents that, since mid-2015, had been filed under seal, a further extension of time to oppose the Sanctions Motion, and leave of Court to supplement the record with Brad's affidavit (Doc. 78). This Court granted the combo Motion in full and denied as moot the Appointment Motion (Docs. 79–80). Brad's Opposition was filed September 18, 2015 (Doc. 84), four months after the Motion was filed and one month after this Court granted the combo Motion. Also in mid-September 2015, this Court denied Cleves' Motion

23

for Reconsideration of the combo Motion Order (Docs. 83, 86).  This Court held a three-day evidentiary hearing in October 2015 (Dkt. Entries 10/19/15, 10/20/15, and 10/21/15), and sought supplemental briefing from the parties in November 2015 (Docs. 98–100).

Brad only briefly argues that he lacks notice that his conduct could have led to dismissal with prejudice (Doc. 84 at 21–22).  That argument, however, was premised on the view that it would be inappropriate to grant dismissal on the basis of adverse inferences, related to Brad's privilege assertions, after Brad had withdrawn those assertions (*see id.*).  After a deposition, several rounds of briefing related to the Sanctions Motion, several extensions of time, numerous telephone conferences with this Court, leave to withdraw his privilege assertions, a three-day evidentiary hearing (which featured almost seven hours of his testimony), and this Court's request for supplemental briefing, Brad received sufficient notice that this Court was considering the sanction of dismissal with prejudice. *See Harmon*, 110 F.3d at 368.

### Sanctions Short of Dismissal with Prejudice will not Protect the Integrity of this Court's Proceedings

This Court must consider whether a sanction short of dismissal with prejudice would "protect the integrity of pretrial procedures." *Freeland v. Amigo*, 103 F.3d 1271, 1280 (6th Cir. 1997).  The Sixth Circuit explains that "a district court should impose a penalty short of dismissal *unless* the derelict party has engaged in bad faith or contumacious conduct." *Harmon*, 110 F.3d at 367 (quotation marks omitted) (emphasis added); *see also Knoll*, 176 F.3d at 366 (explaining the importance of the willfulness, prejudice, and notice factors "fades in the face of the conclusion that dismissal was warranted by contumacious conduct").  "'Contumacious' is defined as 'perverse in resisting authority' and 'stubbornly disobedient.'" *Schafer*, 529 F.3d at 737 (quoting WEBSTER'S THIRD INTERNATIONAL DICTIONARY 497 (1986)).

24

Courts have granted dismissal with prejudice as a sanction for a party's evident refusal to fully disclose the nature and extent of his or her theft of documents from an opposing party.  In *Eagle Hospital Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009), the court affirmed the sanction of dismissal with prejudice for plaintiff's prolonged access to privileged materials and his "refusal to explain the extent of his electronic eavesdropping or his ongoing ability to intercept privileged communications."  There, the district court confronted serious gaps in the evidentiary record -- invoking the Fifth Amendment, the plaintiff refused to testify regarding "how and when he had obtained the privileged and internal emails. . . . and whether he continued to have the ability to intercept privileged internal and attorney-client email communications."  The district court filled those gaps in the hearing record with adverse inferences based on plaintiff's privilege assertion.  *Id.* at 1302–03.

While Brad claims that case is extremely inapt (Doc. 100 at 13), this Court sees closer parallels.  Here, the adverse inferences that stack up against Brad are not the product of his now-withdrawn privilege assertion, but of his own riddled testimony.  This Court can never know the extent of Brad's access to Cleves' information; and Cleves has produced enough evidence to support a finding that Brad accessed materials more times than Brad has cared to disclose, and reviewed more documents than are included in his limited production.  *See also Ponte v. Sage Bank*, --- F. Supp. 3d ---, 2015 WL 5568087, at *5 (D.R.I.) ("Ponte's refusal to truthfully answer the questions he was asked has made it impossible for this Court to determine with any confidence the actual extent to which Ponte reviewed the privileged information and has complied with this Court's order regarding return of the privilege information to Sage.  Moreover, having heard Ponte testify, this Court has no confidence that, moving forward, Ponte will abide by the discovery rules and this Court's future

25

orders") (granting dismissal with prejudice as sanction); *Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 431 (W.D. Wash. 2002) *aff'd*, 78 F. App'x 588 (9th Cir. 2003) ("Sadly, Mr. Jackson's misconduct did not cease when he finally turned over the stolen materials to their rightful owner.") (granting dismissal with prejudice as sanction).

Brad's deception has also obstructed this Court's efficient handling of its own docket. For more than nine months, the merits of this case has been sidelined in an effort to get at the root of Brad's conduct. All of that delay and work by this Court has yielded little except further questions. This case should have been well on its way to final disposition by now.

Brad's attempt to cover up his theft shows willful defiance of this Court's truth-finding function. Such conduct is classic contumacious behavior. And it is just as clear to this Court that a sanction short of dismissal with prejudice would not protect the integrity of the legal system. Permitting Brad's claims to go forward would reward him for his theft and deception, and set an awful precedent for civil litigation. Less severe, alternative sanctions include a preclusion order or a financial penalty. However, these, and milder sanctions like them, would not address the knowledge Brad gained from the documents he reviewed, and those he did not produce, nor would these lesser sanctions sufficiently punish Brad for his attempted coverup or deter others from similar conduct. Dismissal with prejudice is properly entered here as "the first and only sanction" for Brad's misconduct, because the alternative is fundamentally unfair and would debase the judicial process. *See Harmon*, 110 F.3d at 368. No free pass; nothing less than dismissal will do.

## CONCLUSION

For these reasons, this Court grants Cleves' Motion for Sanctions (Doc. 70) and dismisses with prejudice the Second Amended Complaint (Doc. 37).

IT IS SO ORDERED.

    *s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 31, 2015